UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DANIEL TAVARES, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. |
| ) | 15-13000-FDS |
| BRUCE GELB, ) | |
| CAROL HIGGENS-O'BRIEN, ) | |
| OSWALD VIDAL, ) | |
| STEVEN SILVA, and ) | |
| MICHAEL RODRIQUES, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM AND ORDER ON DEFENDANTS' MOTION TO DISMISS

SAYLOR, J.

This is an action by a former Massachusetts state prisoner pursuant to 42 U.S.C. § 1983. Plaintiff Daniel Tavares has sued various prison officials in their individual and official capacities for violating and conspiring to violate his Eighth and Fourteenth Amendment rights during his incarceration at the Souza Baranowski Correctional Center. The complaint seeks declaratory and injunctive relief as well as compensatory and punitive damages.

Tavares has been convicted of murdering four people, including his own mother. This case arises out of the treatment Tavares allegedly received while incarcerated at Souza Baranowski from August 2013 to January 2016.

In the early 1990s, Tavares began serving a 17-to-20 year sentence for manslaughter. In the summer of 2007, the Massachusetts Department of Corrections, apparently by mistake, released him from prison. Tavares then fled the state and committed two additional murders in

Washington state. In 2013, while serving two consecutive life sentences in Washington state prison for those murders, Tavares was transferred to Souza Baranowski to await trial for a fourth murder that had occurred in 1988. Tavares remained in segregated detention from the time he arrived in Massachusetts until he was transferred back to Washington state in January 2016. He now contends that the defendants placed him in segregated detention in retaliation for the "political firestorm" caused by his release and the subsequent murders.

Tavares alleges that the conditions of his confinement constituted cruel and unusual punishment in violation of the Eighth Amendment, that he was denied due process in violation of the Fourteenth Amendment, and that defendants conspired to deprive him of these rights. Defendants have moved to dismiss the complaint for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6).

For the following reasons, the motion to dismiss will be granted.

## I. **Background**

### A. **Factual Background**

The following facts are presented as stated in the complaint and documents that are uncontested or referred to in the complaint.

As of early 2007, Daniel Tavares was incarcerated in a Massachusetts state prison, having served more than fifteen years on a seventeen-to-twenty year manslaughter sentence for killing his mother. *See Slater v. Clarke*, 700 F.3d 1200, 1202 (9th Cir. 2012). His tenure in prison to that point had not been without incident. As the *Slater* court noted:

> While in prison in Massachusetts, Tavares joined a white supremacist gang, assaulted and threatened staff and inmates, and made threats against the life of then-Governor Mitt Romney and then-Attorney General Thomas Reilly. Just prior to Tavares's release date, he was arraigned for two incidents involving violent assaults on prison staff.

700 F.3d at 1202.

On June 14, 2007, Tavares was transferred to the Souza Baranowski Correctional Center, a maximum security Massachusetts state prison, to await trial on various charges arising out of a violent assault on prison staff in 2006. (Compl. ¶ 17). In July 2007, Tavares was released, apparently mistakenly, on his own recognizance while the assault charges were pending. (*Id.* ¶ 18).

After his release, Tavares fled to Washington state. (*Id.* ¶ 19). In November 2007, he murdered a newlywed couple, Beverly and Brian Mauck. (*Id.*). He was arrested and ultimately convicted of two counts of first-degree murder in Washington and sentenced to two consecutive life sentences plus fifteen years. (*Id.* ¶¶ 11, 19).

Six years after the Washington murders, Tavares was transferred back to Massachusetts to await trial on a first-degree murder charge arising out of the murder of a fourth victim, Gayle Botelho, that had occurred in 1988. (*Id.* ¶¶ 10-11). Tavares arrived at Souza Baranowski Correctional Center on August 27, 2013. (*Id.* ¶ 10).

Immediately upon arriving at Souza Baranowski, Tavares was placed into a segregated unit. (*Id.* ¶ 12). The next day, Tavares was given a classification hearing to review his eligibility for segregation. (Ex. G). At the hearing, he was told that due to the "nature and notoriety of [his] case, past [Department of Corrections] negative prior adjustments [as an inmate] and [his] level A security rating [he] was going to be housed in segregation." (*Id.*).

After 90 days, Tavares was given a classification report stating that he was being held in a segregated unit due to "the nature of past, current and pending offenses, his negative prior adjustments as a MA inmate and his Level A security rating." (Compl. ¶ 12, Ex. A). Every ninety days thereafter, his status was reviewed, and he was issued a new classification report.

3

(Compl. ¶ 13-14). According to the complaint, the reviews were only 90 seconds long and took place at his cell door. (*Id.*). Each time, he was given the same reasons: the nature of his crimes, his history while incarcerated, and his Level A security rating. (*Id.* ¶¶ 12-14, Ex. A).

In addition, each month Tavares received a notification of administrative segregation status that indicated the reason for his segregated status. (*Id.* ¶ 15). The notification Tavares received on September 5, 2013, indicated that he was being held in segregation "[p]ending [i]nvestigation awaiting trial - high profile." (Ex. B-1). The October 2013 notification indicated that he was being held in segregation "[p]ending [i]nvestigation" and "[t]o maintain the secure and orderly running of the institution." (Ex. B-2).

Tavares appealed his classification, without success. (Compl. ¶¶ 13-15). According to the complaint, he contested his status every week with defendants Gelb, Vidal, Silva, and Rodrigues. (*Id.* ¶24). He also sent a letter to defendant O'Brien contesting his detention in the SMU. (*Id.* ¶25). Despite these protests, he remained in segregation until he was transferred back to Washington state on January 15, 2016. (Pl. Opp. to MTD at 1).

In the meantime, in December 2015, Tavares was convicted in the Massachusetts Superior Court for the Botelho murder and was sentenced to life in prison without parole. At the time of his transfer back to Washington, he had been housed in a segregated unit for nearly two and a half years.

The segregated unit in which Tavares was held is classified as a Special Management Unit ("SMU"). (Ex. A). The complaint alleges that although he was held in an SMU, he was "basically housed as a [Departmental Segregation Unit or "DSU"] prisoner but [was] not afforded . . . privileges like DSU prisoners receive." (Compl. ¶ 23). It alleges that while held in the SMU, he was allowed one hour of solitary outdoor recreation time each day in "a steel cage,"

during which he was required to wear leg irons and waist chains. (*Id.*; Ex. G). It further alleges that his confinement in a segregated unit caused a deterioration in his mental state and caused him to lose more than forty pounds because he was denied access to commissary goods. (Compl. ¶ 22).

The complaint alleges that Tavares was housed in segregation "for retaliation and nothing more" because of the "political firestorm" caused by the murders he committed while he was a fugitive in Washington. (Compl. ¶¶ 20-21). It alleges that other inmates who were classified with the same security-risk status were not held in segregation. (*Id.* ¶ 21). It further alleges that inmates housed in disciplinary units were afforded greater privileges than he was, including visitation, television time, and greater access to the commissary. (Ex. G at 4).

The complaint also alleges that during his segregated confinement, Tavares spoke with and sent letters to defendants, but received no relief. (Compl. ¶¶ 24-25). On September 26, 2013, he filed an inmate grievance form challenging his segregated status. (*Id.* ¶ 26). The grievance was denied on November 6, 2013. (*Id.*). He appealed the denial on November 12, and was again denied on November 18, 2013. (*Id.*).

### B.  Massachusetts Procedures for Segregating Prisoners

The Department of Corrections ("DOC") has issued regulations to govern the conditions under which an inmate may be held in a segregated unit for a non-disciplinary reason. *See* 103 Code Mass. Regs. 421.09, 423.08. Under those regulations, inmates at any state correctional facility may be held in segregated confinement in a DSU for administrative purposes. *See* 103 Code Mass. Regs. 421.04, 421.08. Inmates in medium- and maximum security-facilities may also be held segregation in an SMU for administrative or protective purposes.[1]

---

[1] The regulation provides that SMU regulations apply to institutions with "security rating level of 4, 5, or 6." 103 Code Mass. Regs. 423.07. The Department of Corrections now uses the terms "medium security" to refer

The regulations provide substantial procedural protections for inmates housed in a DSU. First, the DOC may refer an inmate to the DSU if there is a "reasonable basis" to believe that the inmate poses a "substantial threat" to the safety of others, to property, or to the operation of a state correctional facility. 103 Code Mass. Regs. 421.09, 421.07. An inmate may remain in the DSU only after a finding by the DSU board "based on substantial evidence" that the inmate meets the above criteria. 103 Code Mass. Regs. 421.09. The DSU Board must hold such a hearing within a reasonable time after referral to determine the inmate's eligibility for continued detention in the DSU. *See* 103 Code Mass. Regs. 421.10(4). Prior to that hearing, the inmate's correction counselor must provide the inmate with a written referral summary that details the aspects of the inmate's record that the board will consider, names witnesses who will be called, and includes copies of documents that will be introduced. *See* 103 Code Mass. Regs. 421.10(1). The DOC must also provide written notice of the hearing describing the Board's powers and procedures. *See* 103 Code Mass. Regs. 421.10(5). Inmates have the right to seek representation by an attorney or law student for the hearing. *See* 103 Code Mass. Regs. 421.11(2).

The DSU Board consists of three members who are appointed by the Commissioner of Correction. *See* 103 Code Mass. Regs. 421.06. The Board must be impartial, and an inmate has the right to challenge the impartiality of any member of the board at the beginning of the meeting. *See* 103 Code Mass. Regs. 421.12(2). The Board is not bound by the rules of evidence and makes all decisions and findings of fact based upon a majority vote. *See* 103 Code Mass. Regs. 421.12(3), 421.12(5). At the hearing, an inmate is permitted to call and cross-examine witnesses, present evidence, and testify. *See* 103 Code Mass. Regs. 421.13. The Board makes a recommendation to the Commissioner, based on the evidence presented at the hearing, as to

---

to prisons formerly designated as level 4 or 5, and "maximum security" to refer to facilities formerly designated as level 6. *See* 103 Code Mass. Regs. 942.03.

whether the inmate is eligible for continued detention in the DSU, should be transferred to a different facility, or should be returned to the general correctional facility population. *See* 103 Code Mass. Regs. 421.15(1). The Board must issue its decision orally to the inmate and in writing reciting the evidence relied upon, the reasons for the decision, the procedures to appeal, and—if the recommendation is for continued detention in the DSU—a conditional release date "not [to] exceed six months except in the most extraordinary circumstances." 103 Code Mass. Regs. 421.15(2)(c)(1). The Commissioner or his designee has the power to accept or reject the recommendation based on the Board's written decision and any objections or written statements filed by the inmate upon receipt of the decision. *See* 103 Code Mass. Regs. 421.17.

Inmates who are found eligible for the DSU shall have their status reviewed at 90 day intervals in accordance with the same procedures. *See* 103 Code Mass. Regs. 421.18. Each month, a committee composed of the DSU administrator or his designee, a correction officer, and the inmate's correctional counselor must meet to review the inmate's case and issue a report that includes recommendations, if any, for releasing the inmate from the DSU. *See* 103 Code Mass. Regs. 421.19.

The regulations governing SMUs give greater discretion to DOC staff at medium- and maximum-security correctional facilities to develop procedures to detain inmates in administrative segregation. *See* 103 Code Mass. Regs. 423.08. At such facilities, the Superintendent must develop procedures regarding the placement, review, and release of inmates from SMUs. *See id.* Inmates may be placed into an SMU when the inmate is awaiting investigation or a hearing for a violation, pending transfer or classification, following a disciplinary hearing, or for his own protection, including upon the inmate's request, when no reasonable alternatives are available. *See* 103 Code Mass. Regs. 423.08(1).

7

The Superintendent must review an inmate's eligibility for segregation within 72 hours of the inmate being placed in the SMU.  *See* 103 Code Mass. Regs. 423.08(2).  A classification committee or other group must review inmates' status every seven days for the first two months and at least every thirty days thereafter.  *See id.*

While held in either a DSU or SMU, inmates are entitled to at least one hour of exercise each day, at least five days per week; nutritionally sound meals that are, with few exceptions, the same as those served to the general population; and access to canteen goods except as inconsistent with the unit's security needs.  *See* 103 Code Mass. Regs. 421.20, 103 Code Mass. Regs. 423.09.  Inmates held in the DSU are entitled to substantially the same visitation rights as inmates held with the general population.  *See* 103 Code Mass. Regs. 421.20.  Inmates housed in administrative segregation in an SMU may have their visitation rights limited when there is an articulable reason for withholding the privilege.  *See* 103 Code Mass. Regs. 423.09.

### C.     **Procedural Background**

Tavares filed this complaint on July 21, 2015, seeking declaratory and injunctive relief from his segregated status, as well as compensatory and punitive damages from all defendants.  The complaint alleges claims under § 1983 for violations of the Eighth and Fourteenth Amendments, and for conspiracy.  Defendants have moved to dismiss the action for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6).

## II.     **Legal Standard**

On a motion to dismiss, the court "must assume the truth of all well-plead[ed] facts and give plaintiff the benefit of all reasonable inferences therefrom."  *Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999)).  To survive a motion to dismiss, the complaint must state a claim that is "plausible on its

face." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). That is, "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555 (citations omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556). Dismissal is appropriate if the facts as alleged do not "possess enough heft to show that plaintiff is entitled to relief." *Ruiz*, 521 F.3d at 84 (quotations and alterations omitted).

## III. Analysis

### A. Claims for Injunctive and Declaratory Relief

The complaint alleges claims for injunctive and declaratory relief. A plaintiff seeking injunctive and declaratory relief under § 1983 must demonstrate a "personal stake in the outcome of the litigation." *Stewart v. McGinnis*, 5 F.3d 1031, 1037 (7th Cir. 1993).

> Once an inmate is removed from the environment in which he is subjected to the challenged policy or practice, absent a claim for damages, he no longer has a legally cognizable interest in a judicial decision on the merits of his claim. Any declaratory or injunctive relief ordered in the inmate's favor in such situations would have no practical impact on the inmate's rights and would not redress in any way the injury he originally asserted.

*Ford v. Bender*, 768 F.3d 15, 29 (1st Cir. 2014) (quoting *Incumaa v. Ozmint*, 507 F.3d 281, 287 (4th Cir. 2007)).

Tavares was transferred from Souza Baranowski Correctional Center to a Washington state prison on January 15, 2015. He is no longer a Massachusetts state prisoner and there is no basis to believe that he will return to Souza Baranowski in the near future. *See Murphy v. Hunt*, 455 U.S. 478, 481 (1982). His claims for injunctive and declaratory relief are, therefore, moot and defendants' motion to dismiss those claims will be granted.

### B. Claims for Damages

Tavares seeks compensatory and punitive damages under §1983 for alleged violations of his Eighth and Fourteenth Amendment rights. Claims for damages against state officials in their individual capacities under §1983 are subject to the doctrine of qualified immunity. *See Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982).[2]

#### 1. Qualified Immunity

The doctrine of qualified immunity protects public employees "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* The qualified-immunity analysis employs a two-part test: "(1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right at issue was 'clearly established' at the time of the defendant's alleged violation." *Maldonado v. Fontanes,* 568 F.3d 263, 269 (1st Cir. 2009) (citing *Pearson v. Callahan,* 555 U.S. 223, 232 (2009)). "The court need not engage in this two-step [analysis] sequentially, but may alter the choreography in the interests of efficiency." *Matalon v. Hynnes*, 806 F.3d 627, 633 (1st Cir. 2015) (*citing Pearson*, 555 U.S. at 236).

For purposes of the second step of the analysis, whether the right in question was "clearly established" depends on "(a) whether the legal contours of the right in question were sufficiently clear that a reasonable [official] would have understood that was he was doing violated the right, and (b) whether in the particular factual context of the case, a reasonable [official] would have

---

[2] The complaint does not specify whether defendants are being sued in their official or individual capacity. Drawing all inferences in favor of plaintiff, the Court assumes that defendants have been sued for damages in their individual capacities.

understood that his conduct violated the right." *Mlodzinski v. Lewis,* 648 F.3d 24, 32-33 (1st Cir. 2011).

To examine whether a right was "clearly established" at the time the complained-of conduct occurred, the court should "examine not only Supreme Court precedent, but all available case law . . . including both federal cases outside [the First Circuit] . . . and state court decisions of the state wherein the [officials] operated." *Wilson v. City of Boston*, 421 F.3d 45, 56–57 (1st Cir. 2005) (quotations and citations omitted). The question is not whether some right has been clearly established at a highly abstract level, but "whether a reasonable official could have believed his actions were lawful in light of clearly established law and the information the official possessed at the time of his allegedly unlawful conduct." *McBride v. Taylor,* 924 F.2d 386, 389 (1st Cir. 1991). Thus, officials may enjoy qualified immunity even though their conduct actually abridged a constitutional right, because the qualified-immunity doctrine "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011).

### a. Fourteenth Amendment Claims

First, the complaint alleges that defendants have violated plaintiff's Fourteenth Amendment right to due process. "The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property." *Board of Regents v. Roth,* 408 U.S. 564, 569 (1972); *see also Aponte–Torres v. University of Puerto Rico,* 445 F.3d 50, 56 (1st Cir. 2006). Analysis of procedural due process proceeds in two steps: "We first ask whether there exists a liberty or property interest of which a person has been deprived, and if so we ask whether the procedures followed by the State were constitutionally sufficient." *Swarthout v. Cooke,* 562 U.S. 216, 219 (2011).

11

It is clearly established that an inmate has a liberty interest in being free from "atypical and significant hardship . . . in relation to the ordinary incidents of prison life." *See Sandin v. Conner*, 515 U.S. 472, 484 (1995). It is also clearly established that the placement of a prisoner in administrative segregation for two and a half years under conditions that are "substantially more restrictive than those . . . [in the] general prison population" constitutes "atypical and significant hardship" sufficient to trigger procedural protections under the Fourteenth Amendment. *See LaChance v. Commissioner of Correction,* 463 Mass. 767, 774 (2012); *see also Hewitt v. Helms*, 459 U.S. 460, 470-71 (1982). Here, Tavares's allegations that during his prolonged segregation his exercise, visitation, recreation, and commissary privileges were restricted are sufficient to make out a claim for a violation of a clearly established liberty interest.

Having found that the complaint has sufficiently alleged a violation of a liberty interest cognizable under the Fourteenth Amendment, the question becomes whether the process Tavares received was sufficient. The complaint alleges that defendants violated Tavares's right to due process by holding him under conditions substantially similar to those found in a DSU without the procedural protections afforded to prisoners held in the DSU. In support of that claim, Tavares relies heavily on the Massachusetts Supreme Judicial Court decision in *LaChance*. 463 Mass. 767. In undertaking the qualified immunity analysis, the Court may consider "state court decisions of the state wherein the [officials] operated" to determine whether a right was clearly established at the time of the complained-of conduct. *Wilson v. City of Boston*, 421 F.3d 45, 57 (1st Cir. 2005) (citing *Starlight Sugar, Inc. v. Soto*, 253 F.3d 137, 144 (1st Cir. 2001)).

In *LaChance*, the SJC considered an inmate's complaint that he had been held in administrative segregation in the SMU at Souza Baranowski for ten months under conditions

similar to those alleged by Tavares. 463 Mass. at 769-71. The court found that the process afforded to the inmate, which consisted of only periodic, informal review of his status, violated his right to due process under the federal constitution. *Id*. at 776-78 (concluding that officers are entitled to qualified immunity under §1983, which is only available for federal claims); *see also Cantell v. Comm'r of Correction*, 2016 WL 6126957, at *5 (Mass. Oct. 21, 2016). The court held:

> [A]n inmate confined to administrative segregation on awaiting action status, whether such confinement occurs in an area designated as an SMU, a DSU, or otherwise, is entitled, as a matter of due process, to notice of the basis on which he is so detained; a hearing at which he may contest the asserted rationale for his confinement; and a posthearing written notice explaining the reviewing authority's classification decision . . . [W]e conclude that in no circumstances may an inmate be held in segregated confinement on awaiting action status for longer than ninety days without a hearing.

*Id.* at 776-77. Ultimately, the court found that the officers were entitled to qualified immunity because the opinion announced a novel rule that "segregated confinement on awaiting action status gives rise to a liberty interest entitling an inmate to notice and a hearing . . . ." *Id*. at 778.

The process Tavares received satisfies the *LaChance* requirements. The complaint alleges that he was placed in the SMU immediately upon arriving at Souza Baranowski; that he was given a hearing the following day at which he was told the reason for his segregation; that his status was reviewed every 90 days thereafter; that he was issued a classification report after the review that indicated the reason for his status; and that he was given the right to appeal his classification. In addition to those classification hearings, Tavares received a notification of administrative segregation status every 30 days that described the reason for his detention in the SMU, and contested his status every seven days with defendants. These procedures are so closely aligned with the procedures outlined in *LaChance* that it is highly likely that DOC staff used the opinion as a roadmap for developing procedures. *See Cantell v. Comm'r of Correction*,

87 Mass. App. Ct. 629, 632, *rev'd. on other grounds,* 2016 WL 6126957 (Mass. Oct. 21, 2016) (finding that the "DOC recognizes that, going forward, it is bound to provide all such inmates the due process rights recognized in *LaChance*."). The complaint does not allege facts sufficient to sustain a claim that "every reasonable official would have understood" that the conditions of Tavares's confinement violated his right to due process. *Ashcroft v. al-Kidd*, 563 U.S. at 741. Instead, the facts in the complaint suggests that DOC officials were working to conform their actions to the requirements of the law. Therefore, the defendants are entitled to qualified immunity on the claims concerning violation of the Fourteenth Amendment right to procedural due process.

      b. **Eighth Amendment Claims**

Tavares next contends that the conditions of his confinement constituted cruel and unusual punishment under the Eighth Amendment. Because the complaint does not allege facts sufficient to suggest that the defendants violated his "clearly established" right to be free from cruel and unusual punishment, it likewise fails to make a showing necessary to overcome defendants' qualified immunity.

The Eighth Amendment prohibits the infliction of "cruel and unusual punishment." That prohibition clearly encompasses "inherently barbaric" punishments, *Graham v. Florida,* 560 U.S. 48, 59 (2010), and conditions of confinement that impose "unnecessary and wanton infliction of pain," *Estelle v. Gamble,* 429 U.S. 97, 102–03 (1976). What is "cruel and unusual" within the meaning of the amendment is determined according to norms that "currently prevail," *Atkins v. Virginia,* 536 U.S. 304, 311 (2002), and includes "deliberate indifference" to prisoners' safety or medical needs, *Minneci v. Pollard,* 132 S.Ct. 617, 619 (2012) (citing *Carlson v. Green,* 446 U.S. 14, 16 (1980), *Farmer v. Brennan,* 511 U.S. 825, 834 (1994)).

Here, Tavares contends that the nature and circumstances of his lengthy detention in the SMU amount to an unconstitutional condition of confinement. To support such a claim, a plaintiff must prove (1) that he suffered a deprivation as a result of confinement that is, "objectively, sufficiently serious" and (2) that the deprivation resulted from conduct by prison officials who possessed a "sufficiently culpable state of mind." *Burrell v. Hampshire County,* 307 F.3d 1, 8 (1st Cir. 2002).

Liberally construed, the complaint alleges that certain conditions of plaintiff's confinement constitute cruel and unusual punishment—namely, daily outdoor exercise that was limited to one hour per day while shackled and confined within a limited space—and reduced access to certain privileges than other inmates held in disciplinary units including visitation, access to commissary goods, and television time.

Courts have not found that such limitations on exercise and access to privileges constitute the kind of "extreme deprivation" that gives rise to Eighth Amendment violation. *Figueroa v. Dinitto*, 52 F. App'x 522, 523 (1st Cir. 2002).  While "exercise is an 'identifiable human need,' the deprivation of which may establish an Eighth Amendment violation," Tavares has not claimed that he has been deprived of exercise. *McGuinness v. Dubois*, 893 F. Supp. 2, 3 (D. Mass. 1995), *aff'd*, 86 F.3d 1146 (1st Cir. 1996) (citing *Wilson v. Seiter,* 501 U.S. 294, 304 (1991)).  Instead, he contends that his outdoor exercise was limited in duration and restricted to a confined area.  However, there is no clearly established right for a prisoner to exercise for the duration and under the conditions he prefers.[3]

---

[3] *See McGuinness v. Dubois*, 893 F. Supp. 2, 4 (D. Mass. 1995), *aff'd*, 86 F.3d 1146 (1st Cir. 1996) (finding no "clearly established right" to outdoor exercise, where inmate was permitted to exercise in his cell); *Wishon v. Gammon,* 978 F.2d 446, 449 (8th Cir. 1992) (finding exercise for 45 minutes a week outdoors did not violate prisoner's Eighth Amendment rights where no injury was suffered); *Bailey v. Shillinger*, 828 F.2d 651, 653 (10th Cir. 1987) (finding exercise for one hour per week outdoors "while restrictive" does not violate the Eighth Amendment); *Ruiz v. Estelle,* 679 F.2d 1115, 1152 (5th Cir. 1982) (finding daily exercise for one hour does not violate the Eighth Amendment), *amended in part, vacated in part on other grounds*, 688 F.2d 266 (5th Cir. 1982));

As for Tavares's allegations that his access to visitation, commissary goods, and television time was reduced compared with inmates housed in different units, the complaint likewise does not set forth allegations sufficient to survive a motion to dismiss. The complaint does not allege that he was denied any of these privileges, or even greatly restricted from enjoying them; instead, the complaint refers to an attached letter in which he contends that others in the prison were given greater privileges than he was afforded. *See* Pl. Ex. G. The Supreme Court has directed that the Constitution "'does not mandate comfortable prisons,' and only those deprivations denying 'the minimal civilized measure of life's necessities,' are sufficiently grave to form the basis of an Eighth Amendment violation." *Wilson v. Seiter*, 501 U.S. at 298 (citing *Rhodes v. Chapman,* 452 U.S. 337 (1981)). Tavares has not alleged such a grave deprivation.

Tavares further contends that the sheer length of his segregated detention on awaiting-action status constitutes cruel and unusual punishment. It is clearly established that "conditions in segregation can be so barbaric as to constitute cruel and unusual punishment." *Furtado v. Bishop*, 604 F.2d 80, 88 (1st Cir. 1979). However, courts have not found that segregated detention alone, even when prolonged or of indefinite duration, constitutes cruel and unusual punishment. *See In re Long Term Admin. Segregation of Inmates Designated as Five Percenters*, 174 F.3d 464, 472 (4th Cir. 1999) (finding that inmate's three-year administrative segregated detention does not violate Eighth Amendment because where "inmates do not contend that the [prison] has failed or will fail to provide them with 'adequate food, clothing, shelter, and medical care' or to protect them from harm . . . the isolation inherent in

---

*cf. Clark v. Clarke*, 2013 WL 1144901, at *6 (D. Mass. Mar. 18, 2013) (finding inmate's allegations that he was deprived of meaningful opportunity for exercise for more than seven years in violation of the Eighth Amendment sufficient for purposes of motion to dismiss because his exercise was limited to one hour per day in a confined area wearing waist chains and leg irons where the "extended duration ma[de] a real difference in the magnitude of the deprivation.").

16

administrative segregation or maximum custody is not itself constitutionally objectionable"). The Supreme Court has likewise found that the length of segregated detention is merely one factor among many to consider in evaluating an inmate's constitutional claims. *See Hutto v. Finney*, 437 U.S. 678, 687 (1978). Based on that authority, there is no clearly established constitutional right to be free from detention in administrative segregation for two and a half years.[4]

Because the complaint does not plead facts sufficient to establish a plausible claim that Tavares's clearly established rights under the Eighth Amendment were violated, defendants are entitled to qualified immunity on that claim.

### 2. State-Law Claim

Tavares further contends that defendants failed to comply with DOC regulations. However, §1983 is available only to challenge state officials' compliance with federal, rather than state, law. *See, e.g., Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 106 (1989). Insofar as Tavares complains that defendant failed to comply with state regulations that are not required by the due process clause of the Constitution, the claims are not cognizable under a claim made pursuant to §1983.

### 3. Conspiracy Claim

The complaint fails to plead facts sufficient to make out a plausible claim for conspiracy. "In an effort to control frivolous conspiracy suits under §1983, federal courts have come to insist that the complaint state with specificity the facts that, in the plaintiff's mind, show the existence

---

[4] Tavares also points to two Massachusetts state court cases holding that it is unreasonable to keep an inmate in segregation on awaiting action status for more than a few months. *See Puckett v. Commissioner of Correction*, 28 Mass. App. Ct. 448, 450 (1990), *Matz v. Dubois*, Civ. Action No. 95-1227-E (Mass. Super. Mar. 14, 1995). However, both cases based their holding on an interpretation of a now-defunct regulation defining "awaiting action" status and explicitly refrained from reaching the constitutional question. *See Puckett v. Commissioner of Correction*, 28 Mass. App. Ct. 448, 450 (1990). Accordingly, they cannot create a clearly established constitutional right to be free from administrative segregated detention for the period that Tavares was so confined.

and scope of the alleged conspiracy." *Slotnick v. Staviskey*, 560 F.2d 31, 33 (1st Cir. 1977). "Conclusory allegations of conspiracy" without reference to specific facts "cannot survive a motion to dismiss." *Id.*  Here, the complaint does not plead the essential allegation of an agreement among the defendants to deprive Tavares of his constitutional rights. *See Bemis v. Kelley*, 617 F. Supp. 837, 843 (D. Mass. 1987). Accordingly, defendants' motion to dismiss the conspiracy charge will be granted.

## IV.     Conclusion

For the foregoing reasons, the motion to dismiss is GRANTED.

**So Ordered.**


/s/ F. Dennis Saylor
F. Dennis Saylor IV
Dated:  November 2, 2016                                        United States District Judge